United States District Court
Northern District of California

1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7

SIDNEY R. POE, JR.,

8

　　　　　　　　　Petitioner,

9

　　　　v.

10

ROSEMARY NDOH, Warden,

11

　　　　　　　　　Respondent.

Case No.  18-cv-02850-HSG (PR)

**ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS;
DENYING CERTIFICATE OF
APPEALABILITY**

12

## I.　INTRODUCTION

13

　　　　Before the Court is the *pro se* petition for a writ of habeas corpus filed pursuant to 28

14

U.S.C. § 2254 by Petitioner Sidney R. Poe. Jr., challenging the validity of a judgment obtained

15

against him in state court.  Respondent has filed an answer to the petition.  Dkt. No. 12.  Although

16

Petitioner was given the opportunity to do so, he did not file a traverse.  For the reasons set forth

17

below, the petition is denied.

18

## II.　PROCEDURAL HISTORY

19

　　　　On February 14, 2013, the Alameda County District Attorney filed an amended

20

information charging Petitioner, who is African-American, and co-defendant Joe Lupe Yepez,

21

who is Latino, with 10 counts.  *People v. Poe*, No. A140447, 2016 WL 6962088, at *1-2 (Cal. Ct.

22

App. Nov. 29, 2016).  Counts 1, 3, 5, and 7 alleged attempted murder; counts 2, 4, 6, and 8 alleged

23

assault with a semiautomatic firearm; count 9 alleged shooting at an occupied motor vehicle; and

24

count 10 alleged shooting at an inhabited dwelling.  Dkt. No. 12-3, ("Clerk's Transcript"), 1CT

25

279-95.  As to all counts, both Petitioner and Yepez were charged with enhancements for the

26

personal use of a firearm; and as to counts 1, 3, 5, and 7, Petitioner was charged with

27

enhancements for personally using and discharging a firearm.  1CT 279-95.

28

　　　　On March 18, 2013, the jury found Yepez not guilty on all counts.  Dkt. No. 15-1,

United States District Court
Northern District of California

("Reporter's Transcript"), 4RT 1565-68.  Meanwhile, the jury found Petitioner guilty of all counts and found all of the firearm enhancements true.  2CT 447-59; 4RT 1568-74.

On November 22, 2013, the trial court sentenced Petitioner to an aggregate term of 35 years in prison.  2CT 554-57; 4RT 1605-07.

On November 29, 2016, the California Court of Appeal affirmed the judgment.  *See Poe*, 2016 WL 6962088, at *9; Dkt. No. 15-3, Ex. 8.

On February 15, 2017, the California Supreme Court denied the petition for review.  Dkt. No. 15-3, Ex. 10.

On May 15, 2017, Petitioner filed the instant habeas petition in this Court.  Dkt. No. 1.  On July 23, 2017, this Court issued an order to show cause.  Dkt. No. 6.  On September 12, 2018, Respondent filed a motion to dismiss the mixed petition, which the Court granted on May 31, 2019.  Dkt. Nos. 8, 9.  On June 17, 2019, Petitioner filed his election to proceed on the one exhausted claim.  Dkt. No. 10.  Pursuant to his election, Petitioner asserts one ground for federal habeas relief, a *Batson/Wheeler*[1] claim, which will be discussed in detail below.  Dkt. No. 1 at 5.[2]

On June 25, 2019, the Court issued an Order to Show Cause and ordered Respondent to answer the petition on the merits.  Dkt. No. 11.  An answer was filed August 14, 2019.  Dkt. No. 12.  Petitioner has not filed a traverse, and the time to do so has passed.

### III.   STATEMENT OF FACTS

The following factual background is taken from the November 29, 2016 opinion of the California Court of Appeal:[3]

---

[1] *Batson v. Kentucky*, 476 U.S. 79, 89 (1986); *People v. Wheeler*, 22 Cal. 3d 258, 276-77 (1978), *disapproved in Johnson v. California*, 545 U.S. 162, 168-69 (2005) (holding proper standard for judging whether prima facie case had arisen was *Batson* "inference of discriminatory purpose" standard, not California's *Wheeler* "strong likelihood" test for successful prima facie showing of bias).

[2] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by the parties.

[3] The Court has independently reviewed the record as required by AEDPA.  *Nasby v. McDaniel*, 853 F.3d 1049, 1055 (9th Cir. 2017).  Based on its independent review, the Court finds that it can reasonably conclude that the state appellate court's summary of facts is supported by the record and that this summary is therefore entitled to a presumption of correctness, *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004), *abrogated on other grounds*, *Murray v. Schriro*, 745 F.3d

United States District Court
Northern District of California

**The Facts**
The facts are not pertinent to the one issue before us, and need not be set forth in detail.  The essential facts are these:

Shortly after midnight on March 18, 2011, Fernando Hernandez was driving in San Lorenzo with three passengers in his car: Brian Renteria, Ruben Estrada, and Manuel Avalos.  While Hernandez's car was in the intersection of Via Toledo and Paseo Grande, a gold Buick pulled up next to them, and a passenger in the Buick, later identified as defendant, "mean-mug[ged]" them.  Hernandez and the others heard gunshots, and Hernandez saw a muzzle flash from inside the Buick.  Hernandez quickly drove off, accelerating to 40 miles per hour, but the Buick stayed with them.  Avalos, who was in the back seat, had been shot, and Hernandez drove to the Eden Township Substation to report what happened.  Clarice Sarente, who lived in the neighborhood, also reported that the front window of her house had been shattered by gunfire.

Officers responded to the scene, saw a gold Buick in close proximity to the reported incident, and pulled it over.  Two people were inside: Joe Lupe Yepez, who was driving, and defendant in the passenger seat.  Both were identified, detained, and searched.  In defendant's front pants pockets the officers found a pistol magazine containing nine rounds of nine-millimeter ammunition.  A Glock semi-automatic pistol was found in front of the passenger seat, with a live round in the chamber.

Defendant testified at trial, telling essentially the same story he told the officers in a statement in which he admitting [sic] the shooting: late on the evening of March 17, 2011, he was at his residence when he was confronted and robbed inside the garage.  Defendant described the suspects as two Hispanic males armed with handguns who took cash from his wallet, two cell phones, house keys, and car keys.  He armed himself with the Glock, co-defendant Yepez picked him up, and they saw Hernandez's car and believed it was associated with the robbery.  Defendant admitted to shooting at the vehicle about six times.

*Poe*, 2016 WL 6962088, at *1.

## IV.   DISCUSSION

### A.   Standard of Review

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable

---

984, 1000 (9th Cir. 2014), unless otherwise indicated in this order.

1    application of, clearly established Federal law, as determined by the Supreme Court of the United

2    States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in

3    light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Williams v.*

4    *Taylor*, 529 U.S. 362, 412-13 (2000).  Additionally, habeas relief is warranted only if the

5    constitutional error at issue "'had substantial and injurious effect or influence in determining the

6    jury's verdict.'"  *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507

7    U.S. 619, 637 (1993)).

8          Section 2254(d)(1) restricts the source of clearly established Federal law to the Supreme

9    Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of

10   the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's

11   decisions as of the time of the relevant state-court decision."  *Williams*, 529 U.S. at 412.  A state

12   court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule

13   that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a

14   set of facts that are materially indistinguishable from a decision of [the Supreme] Court and

15   nevertheless arrives at a result different from [its] precedent."  *Id.* at 405-06.  "Under the

16   'unreasonable application' clause, a federal habeas court may grant the writ if the state court

17   identifies the correct governing legal principle from [the Supreme] Court's decisions but

18   unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "[A] federal

19   habeas court may not issue the writ simply because that court concludes in its independent

20   judgment that the relevant state-court decision applied clearly established federal law erroneously

21   or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  "A federal court

22   may not overrule a state court for simply holding a view different from its own, when the

23   precedent from [the Supreme Court] is, at best, ambiguous."  *Mitchell v. Esparza*, 540 U.S. 12, 17

24   (2003).

25         On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating

26   state-court rulings" and "demands that state-court decisions be given the benefit of the doubt."

27   *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted).  In applying the

28   above standards on habeas review, the Court reviews the "last reasoned decision" by the state

1  court.  *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *Cannedy v. Adams*, 706 F.3d 1148,

2  1156 (9th Cir.), *amended*, 733 F.3d 794 (9th Cir. 2013).

3  In its unpublished disposition issued on November 29, 2016, the state appellate court

4  addressed the merits of Petitioner's *Batson/Wheeler* claim.  *Poe*, 2016 WL 6962088, at *5-9.

5  Therefore, the last reasoned decision as to this claim is the California Court of Appeal's

6  unpublished disposition.  *See Wilson*, 138 S. Ct. at 1192; *Cannedy*, 706 F.3d at 1156.

7  The Supreme Court has vigorously and repeatedly affirmed that under AEDPA, there is a

8  heightened level of deference a federal habeas court must give to state court decisions.  *See Hardy*

9  *v. Cross*, 565 U.S. 65, 66 (2011) (per curiam); *Harrington v. Richter*, 562 U.S. 86, 97-100 (2011);

10  *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam).  As the Court explained: "[o]n federal

11  habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings'

12  and 'demands that state-court decisions be given the benefit of the doubt.'"  *Felkner*, 562 U.S. at

13  598 (citation omitted).  With these principles in mind, the Court addresses Petitioner's

14  *Batson/Wheeler* claim.

15  **B.    Petitioner's *Batson/Wheeler* Claim**

16  Petitioner claims that he was denied his right to equal protection because the prosecutor's

17  peremptory challenge of African-American prospective juror F.B. (hereinafter "F.B.") was racially

18  motivated and, thus, the trial court erred in denying his *Batson/Wheeler* motion.  Dkt. No. 1 at 5.

19  **1.    State Court Opinion**

20  The California Court of Appeal described the factual background of this claim stemming

21  from the jury selection, which took place on February 26, 2013, stating as follows:

22  **The Issue**
   As noted, defendant makes only one argument on appeal, that the trial court erred when it
23  denied his *Batson/Wheeler*[FN 1] motion, a motion in fact made on behalf of co-defendant
   Yepez, and in which defendant joined.  The issue arose as follows:
24
   [FN 1:]  *Batson v. Kentucky* (1986) 476 U.S. 79, 89 (*Batson*); *People v. Wheeler*
25  (1978) 22 Cal. 3d 258, 276-277 (*Wheeler* ), disapproved in *Johnson v. California*
   (2005) 545 U.S. 162, 168.
26
   After introductory matters, jury selection began with the prospective jurors answering
27  questionnaires.  Following the excuses for hardship, 81 prospective jurors remained, four
   or five of whom were African-American.[FN 2]
28

United States District Court
Northern District of California

[FN 2:]  It is possible there were more, as four prospective jurors did not state their race on their questionnaire and one questionnaire was lost.

The court chose to use the six-pack method of jury selection, and on February 25, 18 prospective jurors were called by the clerk and seated in the jury box.  One of the 18 was African-American—F.B.[FN 3]  According to his responses to the questionnaire, F.B. was 56 years old, had lived in Alameda County for 30 years, and worked for the United States Postal Service (Postal Service).  In response to the question, "Have you, a member of your family or a close friend ever been arrested for, accused of, or convicted of any crime, including driving while under the influence of alcohol or drugs?," F.B. answered, "No." He also stated he had never witnessed, or been the victim of, a crime, and had never had a good or bad experience with a police officer.  He had been the victim of sexual harassment.

[FN 3:]  We identify the juror as "F.B." for consistency with the parties' briefs.

During the prosecutor's questioning of F.B., he confirmed some of the information on his questionnaire, including that he had lived in Oakland for 30 years, had never witnessed a crime, and did not know victims of any crime.  As to the last item, F.B. said, "Not really. Just news.  Not involved."  The prosecutor asked, "Nothing even—never had your car broken into or anything like that?"  F.B. said, "Yeah, stuff like that, yeah," and went on to admit that his car had been broken into, his car had been stolen, and that he had reported some crimes to the police.

The prosecutor then asked F.B. about his answer that he had been "harassed at work," and F.B. responded that he "had problems with racism, stuff like that."  It developed that F.B. was currently involved in a lawsuit in Alameda County against the Postal Service—a lawsuit, F.B. confirmed, that was a pretty big deal.

Defendant's attorney briefly questioned F.B., following which the court broke for the lunch recess.  The prosecutor went to his office.  As the prosecutor would later advise the court, he had requested staff to run rap sheets on all prospective jurors, but this had not been done.  So, the prosecutor on his own ran the rap sheet for F.B.

That afternoon, the prosecutor exercised his second peremptory challenge, and excused F.B.  The court said, "[F.B.].  Thank you," after which Yepez's counsel asked to approach the bench.  The reporter's transcript then indicates "[a] discussion was held at the bench but not reported."

The next day, at the conclusion of jury selection, the court noted that Yepez's attorney "properly noticed a *Wheeler* motion," and asked the attorney if she wanted to put something on the record.  Yepez's attorney responded that "in response to the prosecutor excusing [F.B.] . . . before he was excused, I made a *Wheeler/Batson* motion . . . .  Based on the fact that, after the break, I believe it was the lunch break, we came in and Mr. Pastran [the prosecutor] had given . . . Mr. Broome [defendant's attorney] and myself, the criminal history for one juror, and that was [F.B.].  [¶]  And I asked Mr. Pastran at that point where the rest of the histories were and who else had been ran, and he indicated nobody.  He ran one individual, [F.B.], the only African-American seated in the 18 pack and, by my estimation, I believe one of three African-Americans in the entire panel."[FN 4]

[FN 4:]  At this point the court said, "That's not true . . . .  [¶]  . . .  [¶]  There were about four or five," including one of whom Yepez's attorney had challenged for cause.

Defendant's attorney joined Yepez's motion, adding that "this was an extremely limited

6

panel as far as African-Americans were concerned."

The trial court asked the prosecutor if he "want[ed] to be heard," and the prosecutor said, "I do want to augment the record, Your Honor. I don't believe a prima facie case has been established. However, that aside, I do want to respond to some of the comments so that it is in the record." And respond he did, going on for some five pages, during some of which he was interrupted by questions or comments from the court.

The prosecutor began by describing the motion as "tactical," that is, to discourage the prosecutor from challenging any other minority prospective jurors.

The prosecutor then said that his peremptory challenge had to be exercised on one of the 12 prospective jurors in the jury box, and that he was concerned with only two of those 12: "Of the first 12 that were in the box, the only people of those 12 that had limited information on their questionnaires were Juror No. 7 . . . and [F.B.] which would have been Juror No. 12. [¶] I was more concerned about [F.B.] because of his answers, in particular to him filing a lawsuit against the U.S. Postal Department, for one thing."

The prosecutor then noted that in response to the question whether F.B. had experienced "racial, sexual, religious, and/or ethnic prejudice," he had answered "only 'sexual harassment,'" and "When I asked him further about that, he said, in addition to that, it was racial harassment. And when I questioned him even further, he said he was currently involved with litigation with the U.S. Postal Department." And the prosecutor went on: "There can only be, in my mind, one or two scenarios here. [F.B.] is, in fact, a true victim or [F.B.] is not. I would take the chance, should I have kept [F.B.], that he may be involved in some unfair litigation or litigation where he perceived himself to be a victim. [¶] I fully anticipate that in this case that is going to be part of the defense, at least in part with respect to Mr. Poe. It seems like no surprise to myself or anybody, through the questioning or through discussions with Mr. Broome, that the issue is going to be that Mr. Poe is going to say him and his wife were victimized and therefore he had to respond in kind with self-defense or force. [¶] I don't believe it's a meritorious claim. However, I certainly don't want somebody who I don't know if they're going to relate to the victim, I don't know if they're going to associate me potentially with the government, as again he's involved in litigation in a government-type agency."

Next, the prosecutor referred to the "dynamics of jury selection," and explained that he had 20 peremptory challenges, that F.B. was "an unknown quantity" and there were two favorable prospective jurors directly in line behind F.B.: "When I have somebody who's an unknown quantity and I have 20 peremptory challenges, certainly I'm going to do my best to make sure that I can leverage that, to use it to get people whom I believe are going to be more fair to the prosecution, especially when I'm comparing it against somebody whom again I don't know where their loyalties are going to land."

The prosecutor then turned to the argument by Yepez's attorney to the effect that he had run only the rap sheet for F.B., and explained what in fact occurred: "Miss Moore also mentions, put great emphasis on the fact that somehow I only ran him as opposed to 101 people. I gave the entire list to be run by one of the secretaries upstairs. And I went upstairs to see if she had, in fact, run anyone. It turned out she hadn't at that point because she was running somebody else. Again there's a bunch of jury trials occurring right now in this courthouse so she hadn't got to my list yet. [¶] In the limited time I have, in addition to eating my lunch and organizing my case, I didn't have time to run all 12 and certainly not near all 100. [¶] And so the record is clear, I don't think this has been put on the record, but I have, to the extent I've ever gained any information about the potential jurors, that has been passed over to the defense as soon as I've got it throughout this case and they've had the opportunity to look at it."

The prosecutor next indicated that he found it "strange" that F.B. was in an "urban environment" yet had not witnessed a crime.[FN 5]

> [FN 5:] To which the court responded that it had not been a crime victim, despite living in the area for almost 40 years.

The prosecutor then explained that when he questioned F.B. and he said "there was more to this situation with this potential litigation that he's involved with, I felt that there was potentially more that he was not being forthcoming with.  And in response to that, that is why I keyed into that hunch and went upstairs and ran him.  And I would add, for the record, that, in fact, I was correct."  F.B. had "an arrest for misdemeanor [section] 647(b) [prostitution] from 1985 and an arrest for [Vehicle Code section] 14601 [driving with a suspended license] that was dismissed."  And the prosecutor continued: "Now, it wasn't earth shattering but it certainly was of concern to me when so many other jurors had been so forthright in the offenses that they had suffered in their lives.  [¶]  [F.B.], for the record, has an arrest for misdemeanor . . . .  [S]omebody might forget about that, although it is still concerning.  I am a little bit more concerned about the prostitution.  I find it difficult to believe that someone could at least be arrested for, I don't know the circumstances, but I guess allegedly engaging in a prostitution act or soliciting it and not remembering that. That is a concern to me any time somebody is not forthright.

"We saw, as an example throughout this entire case, people talking about instances that happened long ago in different counties and even in a different state and they've still thought it important to bring it forth to the court.

"So for all those reasons, Your Honor, I felt [F.B.] was a valid challenge.  It certainly had nothing to do with race.  And parenthetically, I do always take these, when they are brought forth, I do take some offense to it.  It's offensive to try to say I'm a racist or say anything along those sources, especially since I am a member of a minority group as well who has experienced racism.  So it's always kind of, parenthetically, it's just one other thing that I feel again goes to the extreme lack of making this a meritorious claim."

The trial court ruled, "The first thing is I don't think there's a prima facie case.  There's only one challenge.  Out of all the jurors that were here, he only challenged one person for cause so it doesn't rise really to the level of a prima facie case.  [¶] . . . [¶] We've had prima facie cases before but it always is more than just one single juror.  And it doesn't matter whether they have a conviction or not, as long as he has a rational reason, but we haven't even gotten to that level yet.  [¶]  So the other thing you might want to remember is that we don't really get to that point unless you've used all your challenges.  And no one used all of their challenges for the 12."  "So the court finds there's no prima facie case here involving *Wheeler-Batson*, so that lays that issue to rest."

The jury as sworn had no African-Americans on it.

*Poe*, 2016 WL 6962088, at *2-5 (footnotes in original and brackets added).

    The California Court of Appeal then set forth the relevant state and federal law, and it denied this claim as follows:

### The General Principles
The general rules regarding claimed *Batson/Wheeler* error are settled, set forth, for example, in *People v. Manibusan* (2013) 58 Cal. 4th 40, 75-76:

"A three-step procedure applies at trial when a defendant alleges discriminatory use of peremptory challenges.  First, the defendant must make a prima facie showing that the

prosecution exercised a challenge based on impermissible criteria.  Second, if the trial court finds a prima facie case, then the prosecution must offer nondiscriminatory reasons for the challenge.  Third, the trial court must determine whether the prosecution's offered justification is credible and whether, in light of all relevant circumstances, the defendant has shown purposeful race discrimination.  (*People v. Lenix* (2008) 44 Cal. 4th 602, 612 (*Lenix*).)  'The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the [defendant].'  (*Id.* at pp. 612-613.)

"On appeal, we review the trial court's determination deferentially, 'examining only whether substantial evidence supports its conclusions.  [Citation.]'  (*Lenix, supra,* 44 Cal. 4th at p. 613.)  'We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses.  [Citation.]  So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.  [Citation.]'  (*People v. Burgener* (2003) 29 Cal. 4th 833, 864.)"  (Accord, *People v. Williams* (2013) 56 Cal. 4th 630, 650.)

*Lenix* expressed it this way: "At the third stage of the *Wheeler/Batson* inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.  Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.'  (*Miller-El* [*v. Cockrell* (2003)] 537 U.S. [322,] 339.)  In assessing credibility, the court draws upon its contemporaneous observations of the voir dire.  It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her.  (See *Wheeler, supra,* 22 Cal. 3d at p. 281.)

"Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions.  (*People v. Bonilla* [2007] 41 Cal. 4th [313,] 341-342.)  'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges " 'with great restraint.' " ' "  (*Lenix, supra,* 44 Cal. 4th at p. 613, fn. omitted.)

The Supreme Court has "made clear that 'the trial court is not required to explain on the record its ruling on a *Batson/Wheeler* motion.  (*People v. Reynoso* [2003] 31 Cal. 4th [903,] 919.)  "When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings."  (*People v. Silva* (2001) 25 Cal. 4th 345, 386.)'  ([*People v.*] *Vines* [2011] 51 Cal. 4th 830, 849.)"  (*People v. Mai* (2013) 57 Cal. 4th 986, 1054; accord, *People v. Hensley* (2014) 59 Cal. 4th 788, 803.)

**Introduction to the Discussion**

The parties do not agree on the effect of the court's ruling below—and thus what is the issue before us.  Specifically:

Defendant contends that the "trial court applied an incorrect legal standard in finding appellant failed to meet his stage one burden."  Defendant cites to the literal language of the court—"I don't think there's a prima facie case"—to assert that the court held defendant did not meet his stage one burden.

The Attorney General responds that defendant "*may* be correct, but an alternative interpretation is just as plausible.  [¶]  It is unclear whether the trial court thought that a prima facie case *required* a pattern of multiple challenges, or if it simply thought that the single challenge was the main reason, when considering the totality of the circumstances, that there was not a prima facie case."

Then, after citing one United States Supreme Court case, the Attorney General quotes the observation of the California Supreme Court, that while even the exclusion of a single prospective juror may be the product of an improper group bias, "'As a practical matter, however, the challenge of one or two jurors can rarely suggest a *pattern* of impermissible exclusion.'"  (*People v. Bell* (2007) 40 Cal. 4th 582, 598, quoting *People v. Harvey* (1984) 163 Cal. App. 3d 90, 111.)

The Attorney General continues: "It is possible that the trial court thought that, as a matter of law, one peremptory challenge was insufficient to establish purposeful discrimination.  In that case, the trial court applied the wrong legal standard, and this Court should review its ruling de novo.  On the other hand, the trial court may have understood that it was supposed to look at the totality of the circumstances.  And it just thought that, without more, the single challenge did not establish a prima facie case.  (See *People v. Bell, supra,* 40 Cal. 4th at p. 598 [the challenge of one or two jurors rarely suggests a discriminatory purpose].)

But, the Attorney General candidly goes on, "The problem with that view is that there was more.  The defendants based their *Batson*/*Wheeler* motion on the fact that the prosecutor ran a rap sheet on F.B.  The trial court did not address that reason.  So it is difficult to know whether the trial court simply disregarded that reason as insignificant or irrelevant, or incorrectly thought it did not have to consider that reason because one challenge was insufficient as a matter of law."

Against all that, the Attorney General discusses *People v. Avila* (2006) 38 Cal. 4th 491 (*Avila*), which she describes as "instructive," and which, in her words, involved "a situation very similar to what happened in the present matter,"[FN 6] and where the Supreme Court concluded that the trial court's decision was not entitled to deference.  And the Attorney General concludes, "The same considerations apply here.  Therefore, it seems prudent to 'assume, arguendo, that the court's decision is not entitled to deference.'"  (See also *People v. Bonilla, supra,* 41 Cal. 4th at pp. 341-342, noting that where it is unclear whether the trial court applied the correct standard in finding that defendant failed to state a prima facie case of discrimination, the appellate court must review the record "'independently'" to determine " ' "whether the record supports an inference that the prosecutor excused a juror" on a prohibited discriminatory basis' "; accord, *People v. Howard* (2008) 42 Cal. 4th 1000, 1017 ["[w]here . . . it is not clear whether the trial court used the reasonable inference standard, we review the record independently"].)

> [FN 6:]  As described in *Avila*, "The trial court . . . did not articulate the standard it used in ruling that no prima facie case of group bias had been shown as to the excusal of Prospective Juror S.A.  The court, however, noted that 'no pattern' had been established, and when Richard asserted there need not be more than one excusal for the court to find a violation, it disagreed, stating case law indicated there must be a 'pattern or a prima facie case.'"  (*Avila, supra,* 38 Cal. 4th at p. 553.)

And so we proceed, without deference to the trial court's ruling.

At the same time, we deem it unnecessary to determine in the first instance whether the motion demonstrated a step one showing of a prima facie case.  Rather, we will follow the practice suggested in *People v. Scott* (2015) 61 Cal. 4th 363, where the Supreme Court explained that even when a trial court finds no prima facie case, the preferred practice is to allow the prosecutor to state his reasons for the challenge on the record, a practice that permits the reviewing court to resolve the matter even if it finds that the trial court erred in finding there was no prima facie case.  (*Id.* at p. 388.)  Here, the prosecutor put his reasons

for the challenge on the record—a record, we conclude, that rebutted any inference of racial discrimination.  (*People v. Silva, supra,* 25 Cal. 4th at p. 384.)

**There Was No *Batson/Wheeler* Violation**
Defendant's substantive arguments both focus on the fact the prosecutor obtained F.B.'s rap sheet, and apparently no other.  Thus, defendant first argues that "The Fact That The Only Rap Sheet Requested Was That Of The Only African American Prospective Juror In The Jury Box Supports The Inference That The Prosecutor Was Motivated By Prohibited Bias."  The second argument is that "The Prosecutor's Reasons For Requesting F.B.'s Rap Sheet And No Others Are Implausible And Pretextual."

We disagree—and also disagree with defendant's treatment of the record.

To begin with, and contrary to defendant's argument that the prosecutor "request[ed] only F.B.'s rap sheet," the prosecutor represented that he in fact requested rap sheets for the entire venire, but the support staff was unable to provide them in a timely manner.  So, with limited time during his lunch break, the prosecutor asked for the rap sheet on F.B. because he seemed to be particularly evasive—and the prosecutor had a hunch F.B. was hiding something.  In short, the prosecutor singled out F.B. only after his request for a complete set of rap sheets went unfulfilled, and he chose the rap sheet of the prospective juror who concerned him the most.

Defendant also states that "the prosecutor devoted most of his statement to defending his request for F.B.'s rap sheets."  We read the record differently, with the rap sheet explanation taking up less than a page of the prosecutor's five page statement of reasons.

Defendant also asserts that there was "nothing about" F.B.'s answers at voir dire "that suggested a need to investigate F.B.'s criminal history."  To the contrary, in the course of voir dire, F.B. contradicted a few answers on his questionnaire.  While F.B. indicated on his questionnaire that he had never been the victim of crime, and during voir dire confirmed he did not know any victims of crime, on further questioning he admitted his car had been broken into, his car had been stolen, and he had in fact reported some crimes to the police.

Likewise, the questionnaire asked, "Have you been exposed to racial, sexual, religious and/or ethnic prejudice?"  F.B. checked, "Yes," and answered, "Sexual Harassment." However, during voir dire F.B. explained that he had filed a lawsuit, a lawsuit primarily about "racism," a lawsuit that he confirmed was "a pretty big deal."  While it is not clear whether F.B.'s answer on the questionnaire was carelessly incomplete or intentionally misleading, he chose not to indicate "racial . . . prejudice" even thought it was a category explicitly listed on the questionnaire—and even though he later described that as the focus of his lawsuit.  All of this supports a conclusion that the prosecutor ran F.B.'s rap sheet out of concern for his credibility, not his race.

There is a presumption the prosecutor acted properly, and it was defendant's burden to prove that the challenge was racially motivated.  (See *People v. Manibusan, supra,* 58 Cal. 4th at pp. 75-76; *People v. Trinh* (2014) 59 Cal. 4th 216, 240-241.)  The mere fact that the prosecutor ran a rap sheet on F.B. did not rebut the presumption.

Defendant's reply brief argues that the prosecutor's "failure to request any other rap sheets supports the inference that his request for F.B.'s rap sheet was motivated by prohibited group bias," and states that of the "18 prospective jurors seated 'in the box' before" the challenge of F.B., "only one acknowledged any personal criminal history."  The brief goes on to list the 18 prospective jurors in a footnote, with their claimed responses (doing so without any record reference).  Regardless, the fact is that what concerned the prosecutor was that F.B.'s answers during voir dire indicated his questionnaire answers were false.

United States District Court
Northern District of California

Defendant made no comparable showing as to the other 17 prospective jurors.

*Poe*, 2016 WL 6962088, at *5-8 (footnote in original and brackets added).  Thus, the state

appellate court found that the prosecutor adequately explained why he only ran prospective juror

F.B.'s rap sheet.  *Id.* at *8-9.  As further explained in detail below, the state appellate court then

elaborated on the prosecutor's reasons before rejecting Petitioner's claim that they were

"implausible and pretextual."  *Id.* at *8.  Thus, in affirming the judgment, the state appellate court

found no merit to Petitioner's *Batson/Wheeler* claim upon concluding that "the prosecutor had

legitimate reasons for challenging F.B., and [Petitioner] ha[d] not carried his burden of proving

those reasons were pretextual."  *Id.* at *9.

### 2.       Applicable Federal Law

The use of peremptory challenges by either the prosecution or defense to exclude

cognizable groups from a jury may violate the Equal Protection Clause.  *See Georgia v.*

*McCollum*, 505 U.S. 42, 55-56 (1992).  The Supreme Court has held that the Equal Protection

Clause forbids the challenging of potential jurors solely on account of their race.  *See Batson*, 476

U.S. at 89.[4]  *Batson* permits prompt rulings on objections to peremptory challenges under a three-

step process:

First, the defendant must make a prima facie showing that the prosecutor exercised a

peremptory challenge based on race "by showing that the totality of the relevant facts gives rise to

an inference of discriminatory purpose."  *Batson*, 476 U.S. at 93-94.

Second, if this showing is made, the burden then shifts to the prosecutor to offer a race-

neutral explanation for the strike.  *Id.* at 97; *Wade v. Terhune*, 202 F.3d 1190, 1195 (9th Cir.

2000).

Finally, the trial court must determine whether the defendant has carried his burden of

proving purposeful discrimination.  *Id.* at 98; *Wade*, 202 F.3d at 1195; *Green v. Lamarque*, 532

F.3d 1028, 1030 (9th Cir. 2008) ("Third, if the prosecutor offers a race-neutral explanation, the

trial court must decide whether the defendant has proved the prosecutor's motive for the strike was

---

[4] The California procedural counterpart to *Batson* is *Wheeler*.  *See McDaniels v. Kirkland*, 813
F.3d 770, 773 (9th Cir. 2015) (en banc).

United States District Court
Northern District of California

purposeful racial discrimination.").  To fulfill its duty, "the trial court must evaluate the prosecutor's proffered reasons and credibility under 'the totality of the relevant facts,' using all the available tools including its own observations and the assistance of counsel."  *Mitleider v. Hall*, 391 F.3d 1039, 1047 (9th Cir. 2004); *Lewis v. Lewis*, 321 F.3d 824, 831 (9th Cir. 2003).  "As part of its evaluation of the prosecutor's reasoning, the court must conduct a comparative juror analysis—that is, it must 'compare African American panelists who were struck with those non-African American panelists who were allowed to serve.'"  *Jamerson v. Runnels*, 713 F.3d 1218, 1224 (9th Cir. 2013) (quoting *Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th Cir. 2012)).  "The prosecution's treatment of minority jurors as compared to its treatment of nonminority jurors is among the facts indicative of the presence of a purpose to discriminate."  *McDaniels v. Kirkland*, 813 F.3d 770, 778 (9th Cir. 2015) (en banc) (citing *Miller-El v. Dretke* ("*Miller-El II*"), 545 U.S. 231, 241 (2005)).  Ultimately, the defendant has the burden of persuading the court that the strike was racially motivated.  *Rice v. Collins*, 546 U.S. 333, 338 (2006) (citing *Purkett v. Elem*, 514 U.S. 765, 768 (1995)).

Specifically, where the state court has failed in its duty to conduct a comparative juror analysis, such an analysis should be undertaken *de novo*, rather than by remanding the case to the state courts to do so.  *LaMarque*, 532 F.3d at 1031 (citing *Miller-El II*, 545 U.S. at 241).  Once the federal court has undertaken the comparative juror analysis, then the court must reevaluate the state decision in light of such analysis and any other evidence pointing toward purposeful discrimination in order to determine whether the state was unreasonable in finding the prosecutor's race-neutral explanations to be genuine.  *Castellanos v. Small*, 766 F.3d 1137, 1148-51 (9th Cir. 2014).

In evaluating the race-neutrality explanation, the court must keep in mind that proof of discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.  *See Hernandez v. New York*, 500 U.S. 352, 355-62 (1991) (no discriminatory intent where Latino jurors dismissed because of possible difficulty in accepting translator's rendition of Spanish language testimony).  It should also keep in mind that a finding of discriminatory intent turns largely on the trial court's evaluation of the prosecutor's credibility.  *See Rice*, 546 U.S. at 340-41;

13

*Lewis*, 321 F.3d at 830.  Because determinations of credibility and demeanor of the prosecutor and jurors lie "'peculiarly within [the] trial judge's province,'" the trial court's ruling on the issue of discriminatory intent is entitled to great deference and must be sustained unless clearly erroneous. *Snyder v. Louisiana*, 552 U.S. 472, 476-82 (2008) (quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)); *see Felkner v. Jackson*, 562 U.S. 594, 596-98 (2011) (per curiam) (reversing Ninth Circuit's "inexplicable" and "unexplained" finding that proffered race-neutral explanations for peremptory strikes were insufficient to outweigh evidence of purposeful discrimination).

A federal habeas court need not dwell on the first step of the *Batson* analysis if the matter has proceeded to the second or third step.  "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot." *Hernandez*, 500 U.S. at 359.  Once a district court has found intentional discrimination (the third *Batson* step), it cannot "reevaluate" that finding based simply on a reassessment of the strength of the initial prima facie case.  *United States v. Esparza-Gonzalez*, 422 F.3d 897, 906-07 (9th Cir. 2005) (applying *Hernandez* and a case upon which it relied, *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)).

The findings of the state trial court on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review.  *See Purkett v. Elem*, 514 U.S. 765, 769 (1995).  So are the findings of the state appellate court.  *See Mitleider*, 391 F.3d at 1050. Under AEDPA, this means that where a challenge to the state court's factual determination is based on extrinsic evidence or evidence presented for the first time in federal court, under 28 U.S.C. § 2254(e)(1) the state court's findings of discriminatory intent are presumed sound unless the petitioner rebuts the presumption by clear and convincing evidence.  *Kesser v. Cambra*, 465 F.3d 351, 368 n.1 (9th Cir. 2006).  Additionally, where review of the state court's factual determination is based entirely on information that was contained in the state court record, under 28 U.S.C. § 2254(d)(2) the federal court must defer to the state court's conclusion that there was no discrimination unless that finding was "'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Cook v. LaMarque*, 593 F.3d 810,

816 (9th Cir. 2010) (citing 28 U.S.C. § 2254(d)(2)) (even though prosecutor gave both persuasive and unpersuasive justifications for strikes, court could not conclude state court's finding of no discrimination was objectively unreasonable where review of voir dire transcript and juror questionnaires showed the most significant justifications in each case were entirely sound); *Kesser*, 465 F.3d at 368 (finding California Court of Appeal's conclusion that a strike was not racially based was unreasonable determination under 28 U.S.C. § 2254(d)(2), and "even satisfie[d] the more demanding standard" of section 2254(e)(1)). Therefore, a federal habeas court can only grant habeas relief "if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Rice*, 546 U.S. at 338. "[I]n evaluating habeas petitions premised on a *Batson* violation, 'our standard is doubly deferential: unless the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported by substantial evidence, we must uphold it.'" *Jamerson*, 713 F.3d at 1225 (citing *Briggs*, 682 F.3d at 1170). The standard is demanding, but not insatiable. *Miller-El II*, 545 U.S. at 240. A federal habeas court will not be bound by state court factual findings unsupported in the record or refuted by it, for example. *See e.g.*, *Castellanos*, 766 F.3d at 1149-50 (concluding that prosecutor's race-neutral reasons were pretextual after conducting comparative analysis and looking at totality of relevant circumstances); *Kesser*, 465 F.3d at 358 (granting writ based upon a finding that the California court in "failing to consider comparative evidence in the record before it that undeniably contradicted the prosecutor's purported motivations, unreasonably accepted his nonracial motives as genuine").

### 3. Analysis

Petitioner contends that the fact that the prosecutor only ran a rap sheet on F.B. (an African-American male like Petitioner) shows that he had an improper racial motivation. Dkt. No. 1 at 5; Dkt. No. 15-3 at 14. However, as noted above, the state appellate court rejected Petitioner's *Batson/Wheeler* claim upon concluding that the prosecutor gave legitimate race-neutral reasons for peremptorily challenging F.B., including explaining why he only ran that particular prospective juror's rap sheet. *Poe*, 2016 WL 6962088, at *7-9.

Respondent argues that the state appellate court was reasonable in its determination that

1    Petitioner failed to carry his burden of proving that the prosecutor's reasons for striking F.B. were

2    pretextual because the prosecutor "gave legitimate race-neutral reasons for running the rap sheet."

3    Dkt. No. 12-1 at 19-22.  Respondent points out that under Ninth Circuit authority, the state court's

4    determination as to a credibility finding (that is entitled to deference) and its conclusion that there

5    was no purposeful discrimination are subject to federal habeas review under section 2254(d)(2) for

6    "an unreasonable determination of the facts in light of the evidence presented in the State court

7    proceeding."  *Id.* at 11 fn. 2 (citing *McDaniels*, 813 F.3d at 778).  Respondent adds that the Ninth

8    Circuit views this standard as "doubly deferential."  *Id.* (citing *Sifuentes v. Brazelton*, 825 F.3d

9    506, 518 (9th Cir. 2016)).

10         In evaluating Petitioner's *Batson/Wheeler* claim, the Court reviews the state appellate

11   court's opinion on direct appeal as the last reasoned decision of the state court.  *Ali v. Hickman*,

12   584 F.3d 1174, 1181 n.5 (9th Cir. 2009).  And as Respondent has correctly pointed out, the state

13   appellate court's findings on the issue of discriminatory intent are findings of fact entitled to

14   AEDPA deference under section 2254(d)(2).  *Briggs*, 682 F.3d at 1170 and n.4.

15         Here, it is important to first point out that the trial court did not make an express finding on

16   the record whether Petitioner carried his burden of proving purposeful discrimination and did not

17   perform a comparative analysis.  As mentioned above, the record shows that the *Batson/Wheeler*

18   motion made by Yepez's attorney (and joined by Petitioner's attorney) was related to the

19   prosecutor's peremptory striking of F.B., and specifically based on an argument that the

20   prosecutor's reason for running a rap sheet on F.B. was pretextual.  Feb. 26, 2013 RT 1-2.  After

21   this *Batson/Wheeler* motion was made, the prosecutor argued that no prima facie case had been

22   established because he merely "kicked one person of African-American descent."  Feb. 26, 2013

23   RT 3.  The prosecutor went on to "augment the record" by providing race-neutral reasons for

24   dismissing F.B.  Feb. 26, 2013 RT 3-7.  But, even though such reasons were put on the record, the

25   trial court chose to deny the *Batson/Wheeler* motion based on its conclusion that, without more,

26   "one challenge" to a single African-American juror "doesn't rise really to the level of a prima

27   facie case."  Feb. 26, 2013 RT 3-7.  However, the state appellate court noted that the parties "d[id]

28   not agree on the effect of the [trial] court's ruling . . . ."  *Poe*, 2016 WL 6962088, at *6.  Petitioner

United States District Court
Northern District of California

16

contended on direct appeal that the "trial court applied an incorrect legal standard in finding appellant failed to meet his stage one burden." *Id.* Meanwhile, the state appellate court pointed out that the Attorney General responded that Petitioner "*may* be correct, but an alternative interpretation is just as plausible." *Id.* (emphasis in original). Specifically, the Attorney General argued: "It is unclear whether the trial court thought that a prima facie case required a pattern of multiple challenges, or if it simply thought that the single challenge was the main reason, when considering the totality of the circumstances, that there was not a prima facie case." *Id.* The state appellate court further noted that the Attorney General pointed out that the trial court did not address the prosecutor's reason for running a rap sheet on F.B., which was the main basis for the *Batson/Wheeler* motion. *Id.* Nonetheless, the state appellate court chose to proceed "without deference to the trial court's ruling" and "deem[ed] it unnecessary to determine in the first instance whether the motion demonstrated a step one showing of a prima facia case." *Id.* at *7. In doing so, the state appellate court pointed out that, even in the absence of burden shifting, the prosecutor chose to make a record by going forward with an offer of permissible race-neutral justifications for the challenged peremptory strike of F.B. *Id.* Thus, the state appellate court decided to analyze the third step of the *Batson* analysis de novo and concluded that such a record "rebutted any inference of racial discrimination." *Id.*

Because the state appellate court proceeded to consider the prosecutor's proffered race-neutral explanations for striking F.B. and determined that the peremptory challenge was not racially motivated, this Court will proceed directly to the ultimate *Batson* question of whether Petitioner has shown purposeful discrimination. *Cf. Hernandez*, 500 U.S. at 359 (suggesting that once prosecutor has offered race-neutral explanation for peremptory challenge and state court has ruled on ultimate question of intentional discrimination, preliminary issue of whether defendant has made prima facie showing becomes moot).

The issue is whether the third element of a prima facie case of discrimination is met; namely, whether the circumstances of the case raise an inference that the challenge was based on race. In *Batson*, the Supreme Court held that, in "deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances," and noted that a

17

"prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose." *Williams v. Runnels*, 432 F.3d 1102, 1107 (9th Cir. 2006) (quoting *Batson*, 476 U.S. at 96-97). The Supreme Court reiterated in *Johnson* that a defendant may rely on "any other relevant circumstances" to raise an inference of discriminatory purpose. 545 U.S. at 170. The Court now turns to the third *Batson* step and evaluates whether the state appellate court was objectively unreasonable in making a credibility determination that was supported by substantial evidence, *Jamerson*, 713 F.3d at 1225, and whether there is evidence of purposeful discrimination, *see Hernandez*, 500 U.S. at 355-62. The Court will also conduct a comparative juror analysis. As discussed below, it is clear no constitutional violation occurred because there were proper race-neutral reasons for excusing F.B.

The California Court of Appeal gave the following background and explained its reasoning for finding no evidence to support an inference of discriminatory purpose:

> Defendant's other substantive argument, in nine short paragraphs, is that "the prosecutor's reasons for requesting F.B.'s rap sheet and no others are implausible and pretextual." The essence of defendant's argument is as follows:
>
> "To justify his decision to investigate F.B.'s criminal history, the prosecutor needed to explain both why he requested appellant's rap sheet and why he requested nobody else's. With regard to the latter question, the prosecutor explained that his support staff had not obtained the rap sheets of the entire panel and that he had to make the requests himself during the lunch recess.
>
> "The prosecutor claimed that 'in the limited time I have, in addition to eating my lunch and organizing my case, I didn't have time to run all 12 and certainly not near all 100.' The prosecutor failed to specify how long it would have taken to request additional rap sheets or how much time he had available to do so. This vague and evasive explanation supports the inference that the prosecutor had sufficient time to request more rap sheets but wanted to suggest that he did not.
>
> "The prosecutor also claimed his concerns were focused on the responses of F.B. and Juror No. 7, both of whom gave 'limited' responses and that he ultimately requested F.B.'s rap sheet because he had more concerns about F.B. than Juror No. 7. The prosecutor failed to explain why he did not request both rap sheets and nothing in his response suggests an explanation.
>
> "The prosecutor claimed that he feared that as someone claiming to be a victim of discrimination, F.B. might identify with appellant, who was likely to claim self defense in firing a gun at a vehicle with four armed occupants. Appellant contends that it is ludicrous . . . ."

18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

> We conclude otherwise.  To prove that the prosecutor's reason for running a rap sheet on F.B. was pretextual, defendant must show that there was either no good reason to check on F.B. or that other prospective jurors in the box should have raised equal or greater doubts.  He has shown neither.  Before the prosecutor even ran F.B.'s rap sheet, he had learned that F.B. did not answer truthfully in his questionnaire about having been the victim of a crime and that F.B. omitted the fact that he had been subjected to sexual harassment, to the point he sued his employer, the Postal Service.

> The record reflects that the prosecutor had legitimate reasons for challenging F.B., and defendant has not carried his burden of proving those reasons were pretextual.  (See *People v. Arias* (1996) 13 Cal. 4th 92, 136; *People v. Turner* (1994) 8 Cal. 4th 137, 165.)

*Poe*, 2016 WL 6962088, at *8-9.

The state appellate court reasonably found that the evidence did not support an inference that the prosecutor exercised his peremptory challenge against F.B. with a racially discriminatory purpose.  First, the removal of one African-American prospective juror from the initial 18-person venire panel does not, on its own, support an inference of purposeful discrimination, particularly where the surrounding circumstances strongly indicate otherwise.  *See Fernandez v. Roe*, 286 F.3d 1073, 1078-79 (9th Cir. 2002) (stating that prosecutor's strike of the only two African-American venire members would not alone ordinarily support inference of discrimination).  Here, the surrounding circumstances strongly indicate that there was no discriminatory purpose.  The state appellate court reasonably found that the prosecutor had cause to run F.B.'s rap sheet because "in the course of voir dire, F.B. contradicted a few answers on his questionnaire relating to being a victim of crime and being the victim of racial discrimination."  *Poe*, 2016 WL 6962088, at *7.

Moreover, the state appellate court noted that, contrary to Petitioner's argument that the prosecutor "request[ed] only F.B.'s rap sheet," the record shows the prosecutor requested rap sheets on *all* the prospective jurors, but support staff was unable to provide them in a timely manner.  *Id.*  It also appears that the prosecutor ran F.B.'s rap sheet during the lunch break immediately following his questioning of F.B.  Feb. 26, 2013 RT 1.  The prosecutor elaborated that because his time was limited during his lunch hour, support staff had not provided any of the requested rap sheets and, because F.B. was of particular concern, he made a legitimate tactical decision to run only F.B.'s rap sheet.  Feb. 26, 2013 RT 5.  Furthermore, the prosecutor stated that

aside from F.B., the only other prospective juror who gave him concern was Juror No. 7 because of the limited information on that juror's questionnaires, but Juror No. 7 was "later excused by the defense."  Feb. 26, 2013 RT 3.  Thus, the Court finds the state appellate court reasonably determined that, contrary to Petitioner's argument, race was not the only plausible explanation for the prosecutor running F.B.'s rap sheet and instead, it was "out of concern for [F.B.'s] credibility." *Poe*, 2016 WL 6962088, at *7.  Given the record of F.B.'s failure to answer truthfully about having been a victim of a crime and omission of the fact that he had been subjected to sexual harassment, the state appellate court reasonably found the evidence did not support an inference that the prosecutor wanted to remove F.B. for a discriminatory purpose.  *Id.* at *8-9.

Furthermore, as mentioned above, an inference of a discriminatory purpose showing a prima facie case of discrimination under *Batson*'s first step may also be gleaned from a comparative juror analysis—i.e., determining whether non-challenged jurors possess any of the characteristics on which the prosecution challenged jurors in the protected group.  *Boyd v. Newland,* 467 F.3d 1139, 1147-48 (9th Cir. 2006).  Here, however, such an analysis does not support an inference of a discriminatory purpose.  None of the other jurors, including those who were not African-American, gave conflicting answers that reflected on their credibility and otherwise could have led the prosecutor to run their rap sheets.  As discussed above, the state appellate court concluded that F.B., whose "answers during voir dire indicated his questionnaire answers were false," was not similarly situated to the other jurors because Petitioner failed to make such a "comparable showing as to the other 17 prospective jurors."  *Poe*, 2016 WL 6962088, at *8.  The state appellate court further determined that Petitioner failed to show "there was no good reason to check on F.B. or that other prospective jurors in the box should have raised equal or greater doubts."  *Id.*  The state appellate court's conclusion was therefore reasonable.  *See Briggs*, 682 F.3d at 1171 n.6 ("Where the state court conducted comparative analysis and determined that the prosecutor did not exercise her peremptory challenges in a discriminatory manner, AEDPA deference applies and we need not undertake comparative analysis de novo.").  Thus, a comparative juror analysis does not uncover any evidence that would support an inference of a discriminatory purpose in the prosecutor's challenge to F.B.

United States District Court
Northern District of California

In sum, having considered the prosecutor's proffered reasons and credibility under "the totality of the relevant facts," *see Mitleider*, 391 F.3d at 1047, the Court finds that the state appellate court was not unreasonable in concluding that the prosecutor had legitimate reasons for challenging F.B., and that Petitioner had not carried his burden of proving those reasons were pretextual. Although a state appellate court is not "in an ideal position to conduct a step three evaluation," it can "use the trial court's findings and the evidence on the record to evaluate the support on the record for the prosecutor's reasons and credibility, and to compare the struck and empaneled jurors," which is what the state appellate court did here, as explained above. *See Lewis*, 321 F.3d at 832. Furthermore, such findings by the state appellate court on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review. *See Mitleider*, 391 F.3d at 1050. As mentioned, because the review of the state court's factual determination was based entirely on information that was contained in the state court record, under 28 U.S.C. § 2254(d)(2) this Court must defer to the state appellate court's conclusion that there was no discrimination unless that finding was "'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *See Cook*, 593 F.3d at 816. It simply cannot be said that the state appellate court's rejection of Petitioner's *Batson/Wheeler* claim was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2). Therefore, Petitioner is not entitled to federal habeas relief on his claim that his right to equal protection was violated when the prosecutor was allowed to use a peremptory challenge to strike F.B. Accordingly, Petitioner's *Batson/Wheeler* claim is DENIED.

### C. Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard, *id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c)

is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, Petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## V.    CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk of the Court shall close the file.

**IT IS SO ORDERED.**

Dated:  9/30/2020

HAYWOOD S. GILLIAM, JR.
United States District Judge